TOWN OF HOLDEN *vs.* WACHUSETT REGIONAL SCHOOL
DISTRICT COMMITTEE & others.[1]

Worcester. September 8, 2005. - December 29, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & CORDY, JJ.

*School and School Committee,* Regional school district. *Education Reform
Act.*

This court concluded that the commissioner of the Department of Education
(department) has the authority to approve or disapprove amendments to
regional school district agreements, where G. L. c. 71, § 14B, implicitly
gave the department the authority to review proposed changes to regional
school district agreements [663-666]; where 603 Code Mass. Regs.
§ 41.03(3) was consistent with § 14B and did not apply only where an
amendment encompassed a reorganization of a regional school district
[666-667]; and where the Board of Education had the statutory authority to
promulgate the regulation [667-668]; moreover, the commissioner properly
exercised his authority in declining to approve a proposed amendment to
the agreement at issue [668-669].

CIVIL ACTION commenced in the Superior Court Department on
August 28, 2002.

The case was heard by *Kenneth J. Fishman,* J., on motions
for summary judgment, and entry of judgment was ordered by
*John S. McCann,* J.

The Supreme Judicial Court granted an application for direct
appellate review.

*John O. Mirick* for the plaintiff.

*Jane L. Willoughby,* Assistant Attorney General, for Depart-
ment of Education.

*Brian W. Riley* for town of Rutland.

MARSHALL, C.J. This case lays bare the tensions between
education reform measures enacted by the Legislature in 1993
(the Education Reform Act, St. 1993, c. 71, which established a
wholly new system for public school finance and governance in

---

[1]Towns of Rutland, Paxton, Princeton, and Sterling.

the Commonwealth) and agreements reached by small towns that joined together (sometimes decades ago) to form regional school districts to provide a quality education beyond their capacity to provide individually. The Education Reform Act encompasses the Legislature's determination that wealthier towns in the Commonwealth pay a higher proportionate share of the costs of educating their students than less affluent towns. At issue here is an attempt by four of five towns in the Wachusett Regional School District (Wachusett district) to redress what they view as an undue financial benefit that the fifth town receives under the Education Reform Act.

The Wachusett district comprises all grades from prekindergarten through grade twelve for its five participating member towns, including Holden and Rutland.[2] It is governed by the Wachusett Regional School District Agreement (Wachusett agreement). Under the Education Reform Act, the commissioner of the Department of Education (commissioner) sets wealth-based minimum required local contributions from each town. See G. L. c. 70, §§ 2, 6. In 2002, four of the Wachusett member towns (all but Rutland) approved a proposed amendment to the Wachusett agreement changing the manner in which the Wachusett district would assess to each member town amounts that the district opted to spend in excess of the annual contributions required by the commissioner. If implemented, the proposed amendment would require the least affluent town (Rutland) to pay almost all of the additional assessment, while a wealthier town (Holden) would pay none. On his review of the proposed amendment, the commissioner declined to approve it.

Holden initiated this lawsuit and moved for summary judgment to challenge the commissioner's authority to review the proposed amendment, as well as his substantive determination declining to approve it. Rutland opposed the motion and moved for summary judgment. As we shall later describe in more detail, a judge in the Superior Court entered summary judgment in favor of Rutland. We affirm, but for reasons different from those of the judge.

1. *Background.* The relevant facts are not disputed. The

[2]The other participating towns are Paxton, Princeton, and Sterling.

Wachusett agreement was first approved by the member towns, the Department of Education (department), and the Emergency Finance Board in 1951, pursuant to G. L. c. 71, § 14B. That statute provides for the establishment of regional school districts and agreements to govern such districts, and requires, inter alia, that each regional school district agreement include "[t]he method by which the agreement may be amended" and "[a]ny other matters, not incompatible with law, which the said [regional district planning] board may deem advisable."[3] The record reflects that the Wachusett agreement was amended at least three times, in 1977, 1993, and 1998.[4] In both 1993 and 1998, i.e., on the two occasions since the enactment of the

---

[3]General Laws c. 71, § 14B, requires, in relevant part, that any such agreement include:

"(*a*) The number, composition, method of selection, and terms of office of the members of the regional district school committee.

"(*b*) The town or towns in which, or the general area within the regional school district where, the regional district school or schools are to be located.

"(*c*) The type of regional district school or schools. . . .

"(*d*) The method of apportioning the expenses of the regional school district, and the method of apportioning the costs of school construction, including any interest and retirement of principal of any bonds or other obligations issued by the district among the several towns comprising the district, and the time and manner of payment of the shares of the several towns of any such expense.

"(*e*) The method by which school transportation shall be provided, and if such transportation is to be furnished by the district, the manner in which the expenses shall be borne by the several towns.

"(*f*) the terms by which any city or town may be admitted to or separated from the regional school district . . . .

"(*g*) The method by which the agreement may be amended.

"(*h*) The detailed procedure for the preparation and adoption of an annual budget.

"(*i*) Any other matters, not incompatible with law, which the said board may deem advisable."

In 1951, when the Wachusett agreement was initially approved, the statute provided that "[c]opies of such agreement shall be submitted to the emergency finance board . . . and the department of education, and, subject to their approval, to the several towns for their acceptance." General Laws c. 71, § 14B, was amended in 2003 to delete the reference to the Emergency Finance Board. St. 2003, c. 46, § 75.

[4]The record does not reflect whether the Wachusett Regional School District Agreement (Wachusett agreement) has otherwise been amended, although the Wachusett agreement itself provides for review and possible amendment every five years. Specifically, § 14.1 of the agreement provides that "[t]he Wachu-

Education Reform Act, the amendments were submitted to and approved by the commissioner.[5]

As required by G. L. c. 71, § 14B, the Wachusett agreement contains a procedure for enacting amendments: "This Agreement may be amended by recommendation of the [Wachusett] Regional School District Committee[6] [committee] and approval of the member towns of the District by majority vote at an annual or special town meeting provided that not more than one town disagrees." As is also required by G. L. c. 71, § 14B, the Wachusett agreement contains a procedure for apportioning expenses: "Payment of all operating costs shall be apportioned among the member towns on the basis of their respective previous five year average total enrollment as of October 1st of each year of the preceding five fiscal years."

The 1993 Education Reform Act "made significant changes to the governing structure and financing of the Massachusetts public school systems." *Massachusetts Fed'n of Teachers, AFT, AFL-CIO* v. *Board of Educ.*, 436 Mass. 763, 765 n.3 (2002). The new system of school finance, codified in G. L. c. 70, requires the commissioner annually to establish a minimum required local contribution from each city or town toward the operation of its public schools. See G. L. c. 70, §§ 2, 6. The complex formula used to calculate each city and town's minimum required contribution is wealth based, and requires relatively wealthier towns to make greater contributions than relatively less affluent towns. *Id.* As is the case with the Commonwealth as a whole, towns in regional school districts that have higher property values, higher income levels, and a greater ability to raise revenue have a relatively larger required

sett Regional School District Agreement shall be reviewed every five years by the Wachusett Regional School District Committee. The Committee shall hold a public hearing to receive comment and proposed changes from the citizens of the member towns. The Committee shall prepare and submit a written report to the Boards of Selectmen of the member towns."

[5] The record does not reveal whether the 1977 amendment was submitted to the commissioner of the Department of Education (commissioner) for his approval.

[6] The Wachusett Regional School District Committee (committee) consists of members elected by each of the five member towns. The number of members from each town fluctuates based on each town's population. The least populous town has two seats on the committee, with other towns having proportionately more seats on the committee.

contribution than towns in which the converse is true. *Id.* See *Hancock* v. *Commissioner of Educ.*, 443 Mass. 428, 437 (2005) (Marshall, C.J., concurring) (Education Reform Act "eliminated the principal dependence on local tax revenues that consigned students in property-poor districts to schools that were chronically short of resources, and unable to rely on sufficient or predictable financial or other assistance from the Commonwealth").

In instituting the new funding scheme, the Legislature specifically provided that the minimum required local contributions supersede the assessments as calculated under a regional school district agreement.[7] Then in 1996, three years after the Education Reform Act, the Legislature provided that members of a regional school district could, with the approval of *every* district member, agree not to be bound by the funding formulas established by the Education Reform Act, but could instead "elect to reallocate the sum of their required local contributions to the district in accordance with the regional agreement." G. L. c. 71, § 16B. In the absence of a unanimous election, the Education Reform Act limits a regional agreement's apportionment formula to allocating assessments, if any, *in excess* of the minimum required local contributions. To that end, G. L. c. 70, § 6, provides: "The district may choose to spend additional amounts; such decisions shall be made and such amounts charged to members according to the district's required agreement."

In March, 2002, the committee voted to recommend amending the Wachusett agreement by eliminating the provision that apportioned excess costs among the five towns on a per capita basis, and substituting a new method of allocating any excess costs the Wachusett district opted to spend. The proposed amendment was designed to work as follows: first, each member town's per capita assessment of the excess spending amount would be calculated. Then, if a member town had paid more

---

[7]Specifically, G. L. c. 70, § 6, provides: "Notwithstanding the provisions of any regional school district agreement, each member municipality shall increase its contribution to the regional district each fiscal year by the amount indicated in that district's share of the municipality's minimum regional contribution in that fiscal year."

under the Commonwealth's system of wealth-based required minimum local contributions than it would have under the per capita system, it would receive a "credit" of the difference, while a town that paid less than it would have under that system would receive a "debit." These debits and credits would be taken into account in establishing the apportionment of the excess costs the committee voted to spend each year.

Although the proposed amendment ostensibly concerned only the apportionment of costs above the minimum local contributions required by the commissioner, the effect of the amendment ensured that the member town with the smallest per student contribution set by the commissioner (Rutland) would be required to pay far more than its per student share of the excess amount that the committee voted to spend each year, while the towns with a relatively greater per student required local contribution (e.g., Holden) would be required to pay far less or even nothing of the excess recommended by the committee. The Wachusett district's proposed 2004-2005 budget starkly illustrates this disparity. According to Holden, the committee voted to spend $3,091,369 to educate the Wachusett district's children beyond the money available from other sources, including the minimum local contributions required by the commissioner. The proposed amendment would require Rutland (the poorest town) to pay approximately $3 million of that amount, while Holden would be required to pay none of it. The other three member towns, Paxton, Sterling, and Princeton, would pay the remaining small amount.

Holden readily acknowledges that the purpose of the proposed amendment was the outcome described above; that is, to require Rutland to pay by far the largest share of the excess because under the wealth-based formula established by the Education Reform Act, Rutland, a less affluent town, was required to pay far less than Holden on a per student basis. As Holden explained: "[I]t is unfair for Rutland to pay significantly less than Holden on a per student basis, particularly when the [Wachusett district] was created on the concept of an equal per student payment from each member town."

At their respective town meetings held during April, May, and June, 2002, Holden, Paxton, Princeton, and Sterling each

voted to adopt the proposed amendment, while Rutland voted not to adopt the proposed amendment. The committee then forwarded the proposed amendment to the commissioner, although the record does not indicate when or for what purpose.[8]

On June 10, 2002, in a letter to the chairman of the committee, the commissioner declined to approve the proposed amendment. The commissioner explained that the proposed amendment "contravene[d] the intent of [G. L. c. 71, § 16B],"[9] created an "unreasonable and unjustifiable burden on a minority of [town] members," and was "arithmetically ambiguous." The commissioner further noted that "[t]o become effective, the amendment must be approved by at least four of the five member towns *and* by the Commissioner of Education" (emphasis added). He additionally stated that the exercise of his approval served "as a check and balance against unreasonable acts by the majority" of the towns, and that his "approval authority is pursuant to the . . . regulations on regional school districts," citing specifically 603 Code Mass. Regs. § 41.03 (1997)[10] and G. L. c. 71, § 14B.

Following receipt of the commissioner's letter, the committee refused to implement the proposed amendment. Holden then commenced this action,[11] and shortly thereafter moved for summary judgment, seeking an order "declaring that the amend-

---

[8]The commissioner states that the committee submitted the proposed amendment to him for his approval pursuant to 603 Code Mass. Regs. § 41.03(3). See note 10, *infra*.

[9]As discussed earlier, G. L. c. 71, § 16B, requires the consent of *all* towns in a regional school district before an agreement's apportionment of costs may supersede the required minimum local contributions as determined by the commissioner.

[10]Title 603 Code Mass. Regs. § 41.03(3) (1997) provides, in relevant part: "The Commissioner shall approve or disapprove a Regional District Agreement, and any subsequent amendments to the Agreement, based on review and recommendation by the Department that the Agreement meets the standards in 603 [Code Mass. Regs. §] 41.00 and applicable law. The decision of the Commissioner shall be final." Title 603 Code Mass. Regs. § 41.00 governs regional school districts.

[11]Holden named as defendants the committee, as well as Rutland, Paxton, Princeton, and Sterling, but alleged that Paxton, Princeton, and Sterling "supported" Holden's position. In their respective answers to Holden's complaint, Paxton, Princeton, and Sterling each indicated "support" for Holden's position. The committee answered that, on September 18, 2002, it had voted not "to take a position at this time but [to] defer to the decision of the Court."

ment was duly approved and should be implemented." Rutland cross-moved for summary judgment. A judge in the Superior Court allowed the department's assented-to motion to intervene as a defendant, and the department filed an opposition to Holden's motion for summary judgment.

The judge denied Holden's motion for summary judgment and allowed Rutland's cross motion for summary judgment. He concluded that, although the proposed amendment appeared "on its face" to conform with the funding procedures mandated by the Legislature, "its actual effect, and its admitted purpose, [was] to offset the minimum regional contribution in a manner that negates the statutorily mandated differential funding and reinstates funding solely on the basis of the regional agreement without unanimous agreement of the member towns." The judge determined that the proposed amendment violated the intent of both the Education Reform Act, specifically G. L. c. 70, § 6, and the Regional School District Act, specifically G. L. c. 71, § 16B. Holden appealed, and we granted its application for direct appellate review.

2. *Discussion.* We consider first Holden's challenge to the authority of the commissioner to approve or disapprove every amendment to a regional school district agreement. Holden argues that neither the Wachusett agreement itself nor the applicable statutes give the commissioner such authority, positing three rationales. First, it contends that G. L. c. 71, § 14B, authorizes the department initially to approve a regional school district agreement, including its method of amendment, but *not* the content of any subsequent amendment to the agreement, provided the amendment is enacted in accordance with the agreement's provisions. When the department initially approved the Wachusett agreement in 1951, it did not reserve the right to review and approve all subsequent amendments. Therefore, Holden continues, the commissioner cannot now assert the right to do so. Next, Holden contends that the provision of 603 Code Mass. Regs. § 41.03, on which the commissioner relies, applies only to amendments that encompass the "reorganization" of a regional school district, which is not at issue here. Third, to the extent that 603 Code Mass. Regs. § 41.03 grants the commissioner broad authority to approve amendments to regional school

district agreements, Holden argues that the regulation is invalid
as promulgated without statutory authority. None of these argu-
ments is persuasive, and we therefore conclude that the com-
missioner has the authority to approve or disapprove amend-
ments to regional school district agreements, and that he
properly exercised that authority in declining to approve the
proposed amendment to the Wachusett agreement.

The commissioner grounded his approval authority on G. L.
c. 71, § 14B, and 603 Code Mass. Regs. § 41.03. We consider
the validity of his position, keeping in mind that "[a]n express
grant [of authority] carries with it by implication all incidental
authority required for the full and efficient exercise of the power
conferred," and that the Legislature "need not enumerate or
specify, definitely and precisely, each and every ancillary act
that may be involved in the discharge of an official duty." *Scan-
nell* v. *State Ballot Law Comm'n*, 324 Mass. 494, 501 (1949).
We must also apply "all rational presumptions in favor of the
validity of the administrative action." *Thomas* v. *Commissioner
of the Div. of Med. Assistance*, 425 Mass. 738, 746 (1997),
quoting *American Family Life Assur. Co.* v. *Commissioner of
Ins.*, 338 Mass. 468, 477, cert. denied, 464 U.S. 850 (1983). "A
highly deferential standard of review governs a facial challenge
to regulations promulgated by a government agency." *Mas-
sachusetts Fed'n of Teachers, AFT, AFL-CIO* v. *Board of Educ.*,
436 Mass. 763, 771 (2002).

Since its enactment in 1949, G. L. c. 71, § 14B, has provided
for the establishment of regional school districts, and requires
that the department, as well as the member towns, approve any
regional school district agreement. As noted earlier, § 14B
further provides that every agreement must include, inter alia, a
method for amending the agreement, and may include "[a]ny
other matters, not incompatible with law, which the said
[regional district planning] board may deem advisable." G. L.
c. 71, § 14B (*g*), (*i*). Section 14B apparently was enacted in
response to a 1949 legislative report supporting the creation of
regional school districts. See 1949 House Doc. No. 2300. The
report specifically considered the role of the department with
respect to such districts and concluded that the department's ap-
proval of every regional school district agreement was advisable

because "there may be a state-wide interest which could not be specifically developed by local considerations alone." See *id.* at 21. Approval by the department, the report continued, "might be desirable to guarantee that the plans proposed in any area were educationally sound, or that the interests of the children or of the taxpayers had been considered with some degree of uniformity throughout the State." *Id.* at 21-22. Implicit in the entire statutory scheme enacted in response to the report is the authority of the department to review proposed changes to regional school district agreements precisely to ensure that any proposed plans are educationally sound. Such plans of necessity encompass arrangements that go to the heart of public education, for example, "[t]he method of apportioning the expenses of the regional school district." G. L. c. 71, § 14B (*d*). We have no hesitation in concluding that, even before the enactment of the 1993 Education Reform Act, the department retained considerable authority to approve plans proposed by a regional school district. See *Watros* v. *Greater Lynn Mental Health & Retardation Ass'n*, 421 Mass. 106, 113 (1995) ("it is a well-established canon of statutory construction that a strictly literal reading of a statute should not be adopted if the result will be to thwart or hamper the accomplishment of the statute's obvious purpose, and if another construction which would avoid this undesirable result is possible").

To the extent that the commissioner's authority was implicit in the 1949 legislation, it was made explicit in the 1993 Education Reform Act, which substantially increased the commissioner's authority over all school districts, including regional school districts. See, e.g., G. L. c. 69, § 1A.[12] As the commissioner explained in his letter to the committee, to permit a majority of the towns of a regional school district to amend an agreement in a manner that is detrimental to a minority would be inconsistent with the financial structure imposed by the Education Reform Act, and "[t]he Commonwealth, which has ultimate responsibility for the quality of public elementary and

---

[12]General Laws c. 69, § 1A, which details the commissioner's duties, was substantially rewritten in 1993 in connection with the passage of the Education Reform Act. The twelfth paragraph of that statute specifically encompasses the duties of the commissioner with respect to regional school districts.

secondary education, has a significant interest in the stable and effective operation of regional school districts."

The committee itself apparently recognized that all amendments to the Wachusett agreement must now be submitted to the commissioner for his review and approval. In both 1993 and 1998, the committee submitted proposed amendments to the Wachusett agreement to the commissioner, to which he gave his approval. The committee apparently did so again in 2002. See note 8, *supra.* The challenge to the commissioner's authority arose only when the commissioner declined to give his approval to a proposed amendment.

As to the regulation at issue, we conclude that 603 Code Mass. Regs. § 41.03(3) is fully consistent with G. L. c. 71, § 14B, and G. L. c. 69, § 1A, and was properly promulgated. The regulation provides that the commissioner "shall approve or disapprove" a regional school district agreement and "any subsequent amendments" to such an agreement. See note 10, *supra.* The commissioner's determination is based on a review and recommendation by the department "that the Agreement meets the standards in [603 Code Mass. Regs. § 41.00][13] and applicable law." *Id.* We reject Holden's contention that the regulation applies only where an amendment encompasses a "reorganization" of a regional school district.

Title 603 Code Mass. Regs. § 41.03, entitled "Department of Education Approval," includes several subparts. Sections 41.03(1) and 41.03(2) pertain to a regional school district's process for submitting reorganization plans to the commissioner for review. Section 41.03(3), however, provides for the commissioner's broad and nonappealable review of a regional school district agreement and "any subsequent amendments" to such an agreement. The department represents that it has consistently interpreted this regulation to require the commissioner to approve *all* amendments to regional school district agreements.[14]

[13]Title 603 Code Mass. Regs. § 41.00, entitled "Regional School Districts," contains four subparts that regulate various aspects of regional school districts.

[14]Title 603 Code Mass. Regs. § 41.03(3) was amended in 1996, effective February 1997. Prior to the amendment, this regulation did not require department approval of amendments to regional school district agreements unless the amendments expanded grade structures or added member towns. See 603

We, of course, give substantial deference to an agency's interpretation of its own regulations. See *Felix A. Marino Co.* v. *Commissioner of Labor & Indus.*, 426 Mass. 458, 461 (1998) ("Once the [department] made an interpretative ruling, [it] resolved the ambiguity that might otherwise have prompted us to construe this statute narrowly . . .").

Holden argues that the regulation itself is invalid because the Board of Education (board) lacked the statutory authority to promulgate it. It correctly notes that G. L. c. 69, § 1B, twenty-fourth par., provides: "The board shall establish such other policies as it deems necessary to fulfill the purposes of this chapter and chapters fifteen, seventy, seventy-one A, seventy-one B, and seventy-four . . . ." Because G. L. c. 71 (which governs, inter alia, regional school districts) is not among the provisions enumerated, Holden posits that the Legislature intended to deny the board the authority to issue regulations concerning amendments to regional school district agreements. We do not agree.

General Laws c. 69, § 1B, was enacted as part of the Education Reform Act of 1993. St. 1993, c. 71, § 29. Pursuant to G. L. c. 69, § 1B, first par., the board is required to "establish policies relative to the education of students in public early childhood, elementary, secondary, and vocational-technical schools." This broad legislative grant of authority gives the board far-reaching power "to withhold state and federal funds from school committees which fail to comply with the provisions of law relative to the operation of the public schools or any regulation" and requires the board to ensure "that all school committees comply with all laws relating to the operation of the public schools." G. L. c. 69, § 1B, seventh and eighth pars. Schools that comprise a regional school district are not exempt from the board's authority, nor are regional school district committees.

Consistent with this extensive grant of authority is the board's authority to promulgate regulations "as necessary to fulfill [its]

Code Mass. Regs § 41.00 (as of February 12, 1993). As explained by the department, important proposed changes to regional school district agreements, which could implicate the purposes of the Education Reform Act, might go unreviewed by the department. The regulation was amended to address this appropriate concern.

purposes." G. L. c. 69, § 1B, twenty-fourth par. Additionally, pursuant to G. L. c. 69, § 1A, twelfth par., "[t]he commissioner shall encourage and facilitate the adoption of regional [school] districts to improve the delivery of a quality public education in an economical manner." While we have been unable to ascertain why G. L. c. 69, § 1B, does not contain a specific cross-reference to G. L. c. 71, the board's promulgation of regulations regarding regional school districts is consistent with both G. L. c. 71, § 14B, and the department's statutory authority generally. The promulgation of 603 Code Mass. Regs. § 41.03 was a valid exercise of the board's authority. See *Massachusetts Fed'n of Teachers, AFT, AFL-CIO* v. *Board of Educ.*, 436 Mass. 763, 773-774 (2002), and cases cited (administrative agency "has the authority to promulgate regulations giving effect to legislative mandates"); *Grocery Mfrs. of Am., Inc.* v. *Department of Pub. Health*, 379 Mass. 70, 75 (1979) (regulatory authority need not be pinpointed to specific statutory language). See also *Globe Newspaper Co.* v. *Beacon Hill Architectural Comm'n*, 421 Mass. 570, 583 (1996) (administrative agency "has jurisdiction to establish regulations that bear a rational relation to the statutory purpose"); *Beth Israel Hosp. Ass'n* v. *Board of Registration in Med.*, 401 Mass. 172, 176 (1987) ("regulation may be authorized though not traceable to specific statutory language, [and] powers granted include those reasonably implied").

Holden additionally argues that the terms of the proposed amendment to the Wachusett agreement comply with both G. L. c. 71, § 16B, and the intent of the Education Reform Act. In his June, 2002, letter to the committee, the commissioner commented that "[r]egional school districts are very important in the Commonwealth's educational system." The Legislature and the board have provided a means for communities to form regional school districts, while maintaining an important and expanded role for the commissioner to review regional school district agreements and all amendments to those agreements to ensure compliance with applicable law and to protect minority towns from overreaching by the majority. Upon his review of the proposed amendment, the commissioner concluded that four towns in the Wachusett district had sought to impose an unfair and unreasonable burden on Rutland. The commissioner's

review and disapproval of the proposed amendment was a lawful exercise of his authority.[15] We therefore need not and do not consider Holden's challenge to the substance of the commissioner's decision.

*Judgment affirmed.*

---

[15]Holden makes no claim that the exercise of the commissioner's authority, if valid, was an abuse of discretion.