366                                461 Mass. 366 (2012)

Town of Dartmouth *v.* Greater New Bedford Regional Vocational Technical High School District.

Town of Dartmouth *vs.* Greater New Bedford Regional Vocational Technical High School District & others.[1]

Bristol. November 7, 2011. - January 24, 2012.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.

*Practice, Civil,* Dismissal. *Municipal Corporations,* Special act, Standing to assert constitutional right. *Education Reform Act. Commonwealth,* Education, Financial matters. *Constitutional Law,* Education, Standing to question constitutionality, Home Rule Amendment.

This court concluded that the public school funding obligations imposed on the member municipalities of a regional school district (district) by the Education Reform Act (act) supersede the funding provisions of an agreement that, under an earlier special act of the Legislature (special act), established the district and apportioned costs to the member municipalities on the basis of each municipality's respective pupil enrollment, where the clear legislative intent evidenced by the act to implement a new public school funding model for the entire Commonwealth, including the district, irrespective of prior legislation such as the special act, repealed by implication the special act. [374-378]

This court concluded that two member municipalities of a regional school district lacked standing to challenge, on constitutional grounds, the public school funding obligations imposed on them by the Education Reform Act (act), where the municipalities, as political subdivisions of the Commonwealth, were not persons for purposes of challenging the constitutionality of the act [378-381], made no allegation that the act represented legislative encroachment on the judicial power in violation of art. 30 of the Massachusetts Declaration of Rights [381], and were not acting in a private capacity and engaging in a purely commercial or business transaction [381-382]; and where, under the Home Rule Amendment, the act's comprehensive overhaul of public school education is a matter of State, regional, and general concern that falls within the ambit of retained legislative power [382-383].

Civil action commenced in the Superior Court Department on February 6, 2008.

A motion to dismiss was heard by *David A. McLaughlin,* J., and entry of judgment was ordered by him.

[1]The Commissioner of Education, the city of New Bedford, and the town of Fairhaven.

461 Mass. 366 (2012) 367

Town of Dartmouth v. Greater New Bedford Regional Vocational Technical High School District.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Anthony C. Savastano* for the plaintiff.

*Thomas P. Crotty* for town of Fairhaven.

*Jennifer Grace Miller*, Assistant Attorney General, for Department of Elementary and Secondary Education.

*John A. Markey, Jr.*, Assistant City Solicitor, for city of New Bedford.

*Richard E. Burke, Jr.*, for Greater New Bedford Regional Vocational Technical High School District, was present but did not argue.

SPINA, J. The present case concerns the way by which the costs of financing the Greater New Bedford Regional Vocational Technical High School District (school district) are apportioned among the city of New Bedford, the town of Dartmouth, and the town of Fairhaven, which are the municipalities comprising the school district (collectively, the member municipalities). In February, 2008, Dartmouth commenced an action in the Superior Court against the school district, the Commissioner of Education (commissioner), New Bedford, and Fairhaven (collectively, the defendants), challenging the funding obligations imposed on the member municipalities by the Education Reform Act of 1993 (Education Reform Act), St. 1993, c. 71, § 32.[2] See G. L. c. 70, § 6. Fairhaven filed a cross claim against the school district, the commissioner, and New Bedford, incorporating the averments of Dartmouth's first amended complaint and, additionally, asserting that the funding obligations imposed by the Education Reform Act were a disproportionate tax on property and income in violation of the Massachusetts Constitution. See Part II, c. 1, § 1, art. 4, of the Massachusetts Constitution; art. 44 of the Amendments to the Massachusetts Constitution.[3]

---

[2] Count I of Dartmouth's first amended complaint, alleging breach of contract, and Count III of the amended complaint, asserting a claim for promissory estoppel, were brought against the school district. Count II of the amended complaint, requesting a declaratory judgment that the funding obligations imposed by the Education Reform Act do not apply to the school district, was brought against all of the defendants. Count IV of the complaint, alleging the unconstitutional impairment of an agreement among the member municipalities, was brought against the commissioner (acting for the Commonwealth).

[3] The Legislature is empowered "to impose and levy proportional and

The school district and the commissioner each filed motions to dismiss Dartmouth's complaint and Fairhaven's cross claim pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), for failure to state a claim on which relief could be granted. Following a hearing, a judge allowed the motions. New Bedford then filed a motion to dismiss Dartmouth's complaint and Fairhaven's cross claim, based on the "law of the case" established by the judge's rulings on the prior motions to dismiss.[4] A different judge allowed the motion. Judgment entered on April 28, 2009, dismissing the complaint filed by Dartmouth and the cross claim filed by Fairhaven. Dartmouth and Fairhaven appealed, and we transferred the case to this court on our own motion.

We now consider whether the public school funding obligations imposed on the member municipalities by the Education Reform Act supersede the funding provisions of an agreement among the member municipalities entered into pursuant to St. 1971, c. 428, which authorized the formation of the school district. We also consider whether the member municipalities, as political subdivisions of the Commonwealth, have standing to challenge the constitutionality of the Education Reform Act. For the reasons that follow, we conclude that the complaint filed by Dartmouth and the cross claim filed by Fairhaven were properly dismissed.

1. *Background.* Given that this is an appeal from a motion to dismiss, we summarize the pertinent facts as set forth in the complaint and the exhibits attached thereto. We begin with an overview of the legislative enactments at issue.

---

reasonable assessments, rates, and taxes, upon all the inhabitants of, and persons resident, and estates lying, within the . . . [C]ommonwealth." Part II, c. 1, § 1, art. 4, of the Massachusetts Constitution. See *Opinion of the Justices,* 220 Mass. 613, 618-619 (1915). Article 44 of the Amendments to the Massachusetts Constitution states, in relevant part: "Full power and authority are hereby given and granted to the general court to impose and levy a tax on income in the manner hereinafter provided. Such tax may be at different rates upon income derived from different classes of property, but shall be levied at a uniform rate throughout the [C]ommonwealth upon incomes derived from the same class of property. The general court may tax income not derived from property at a lower rate than income derived from property, and may grant reasonable exemptions and abatements."

[4]"Where there has been no change of circumstances, a court or judge is not bound to reconsider a case, an issue, or a question of fact or law, once decided." *Peterson* v. *Hopson,* 306 Mass. 597, 599 (1940).

On June 25, 1971, the Legislature enacted St. 1971, c. 428, entitled, "An Act authorizing the formation of a vocational regional school district by the city of New Bedford and the towns of Acushnet, Dartmouth, Fairhaven, Freetown, Lakeville, Mattapoisett and Rochester" (Special Act). Pursuant to the Special Act, New Bedford and each of the named towns were authorized to create a "vocational regional school district planning committee." St. 1971, c. 428, § 1. The planning committees from New Bedford and from any two or more of the named towns were authorized to "join together to form a vocational regional school district planning board," *id.*, the duty of which was "to study the advisability of establishing a vocational regional school district." *Id.* at § 2. Among other responsibilities, the planning board was required to "submit a report of its findings and recommendations" to the city council of New Bedford and the board of selectmen of each participating town. *Id.* If the planning board recommended the establishment of a vocational regional school district, then it was required to submit a proposed agreement setting forth details regarding the creation and operation of such a regional school district to an "emergency finance board," established under St. 1933, c. 49, § 1, and to the Department of Education. St. 1971, c. 428, § 3. Subject to their approval, the proposed agreement was to be submitted "to the several municipalities which are recommended to be included in the district, for their acceptance." *Id.* The Special Act stated that the proposed agreement should set forth, among other things, "[t]he method of apportioning the expenses of the regional school district . . . ." *Id.*

The question whether to accept the terms of the Special Act, providing for the establishment of a vocational regional school district, then was to be presented to the voters of the participating municipalities. See *id.* at § 5. If a majority of the voters in each of those municipalities voted in the affirmative, then the Special Act would become fully effective, and the proposed vocational regional school district would be "deemed to be established forthwith in accordance with the terms of the agreement so adopted." *Id.* The Special Act provided that "[t]he powers, duties and liabilities of the regional school district shall be vested in and exercised by a regional district school committee," *id.* at § 7,

which "shall annually determine the amounts necessary to be raised to maintain and operate the district school or schools during the next fiscal year, . . . and shall apportion the amount so determined among the several municipalities in accordance with the terms of the agreement." *Id.* at § 8. Further, the Special Act stated that "[n]o municipality in the regional school district shall be liable for any obligation imposed on any other municipality in said district by authority of this act, or of any agreement thereunder, any other provision of law to the contrary notwithstanding." *Id.* at § 12.

Municipal officials in New Bedford, Dartmouth, and Fairhaven followed the procedures set forth in the Special Act to establish the school district. A majority of the voters in those municipalities then voted to accept the terms of the Special Act, and to approve the creation and operation of the school district in accordance with the provisions of an agreement among the member municipalities dated February 25, 1972 (regional agreement). The school located in the school district is "an occupational, technical, and vocational high school consisting of grades nine through twelve, inclusive." Extended courses of instruction beyond grade twelve may be provided in accordance with G. L. c. 74, § 37A. The regional agreement set forth the method for apportioning the capital costs and operating costs of the school district among the member municipalities.[5] All operating costs, except those described in the regional agreement as "special operating costs," were to be apportioned to the member municipalities "on the basis of each municipality's respective pupil enrollment in the regional district school."[6]

---

[5] "Capital costs" were defined as "all expenses in the nature of capital outlay, such as the costs of acquiring land, the costs of constructing, reconstructing, or adding to a school building or buildings, the costs of remodeling or making extraordinary repairs to a school building or buildings, the cost of constructing sewerage systems and sewage treatment and disposal facilities, or the cost of the purchase or use of such systems with a municipality, and any other item of capital outlay for which a regional school district may be authorized to borrow." Capital costs also included "payment of the principal of and interest on bonds, notes, or other obligations issued by the district to finance capital costs." "Operating costs" were defined as "all costs not included in capital costs . . . , but including interest on temporary notes issued by the District in anticipation of revenue."

[6] With respect to the formula for the apportionment of operating costs, the regional agreement provided that "[e]ach member municipality's share for

Approximately twenty-two years later, on June 18, 1993, the Legislature enacted the Education Reform Act, see generally G. L. cc. 69, 70, 71, the purpose of which was "to provide immediately for the improvement of public education in the [C]ommonwealth."[7] St. 1993, c. 71, preamble. The Legislature declared that the Education Reform Act was intended to ensure "a consistent commitment of resources sufficient to provide a high quality public education to every child," so that all children would have "the opportunity to reach their full potential and to lead lives as participants in the political and social life of the [C]ommonwealth and as contributors to its economy." G. L. c. 69, § 1. See *Hancock* v. *Commissioner of Educ.*, 443 Mass. 428, 432 (2005) (Marshall, C.J., concurring) (*Hancock*). To that end, the Legislature sought "to assure fair and adequate minimum per student funding for public schools in the [C]ommonwealth by defining a foundation budget and a standard of local funding effort *applicable to every city and town in the [C]ommonwealth"* (emphasis added). G. L. c. 70, § 1.

Pursuant to the Education Reform Act, a "foundation budget" is established for every school district in Massachusetts,[8] G. L.

each fiscal year shall be determined by computing the ratio which that member municipality's pupil enrollment in the regional district school on October 1 of the fiscal year next preceding the fiscal year for which the apportionment is determined bears to the total pupil enrollment in the regional district school from all the member municipalities on the same date."

[7]The Education Reform Act, long under consideration by the Legislature, was enacted just three days after the issuance of our opinion in *McDuffy* v. *Secretary of the Executive Office of Educ.*, 415 Mass. 545 (1993), which held that the Commonwealth has a constitutional duty to provide a minimally adequate public education to all of its children, without regard to the financial resources of the community or district in which the children live. See *id.* at 606, 621. This court stated that the Commonwealth had failed to fulfil this obligation because it had delegated the responsibility for public school education to local communities, and the system of funding primary and secondary public education relied almost entirely on local property taxes. See *id.* at 607, 610-617. Such a funding system had left property-poor communities with insufficient resources to provide their students with educational opportunities comparable to those available to students in property-rich communities. See *id.* at 614-617.

[8]General Laws c. 70, § 2, defines the "[f]oundation budget" as "the sum of the foundation payroll, foundation non-salary expenses, professional development allotment, expanded program allotment, extraordinary maintenance allotment, and book and equipment allotment." The "base year" for calculating the foundation budget was fiscal year 1993. G. L. c. 70, § 2. For subsequent

c. 70, § 3, and is derived from a complex formula designed to account for the number and needs of children living in each district. See G. L. c. 70, §§ 2 et seq. See also *Hancock, supra* at 437-438 (Marshall, C.J., concurring) (foundation budget has been described as Commonwealth's estimate of minimum funding needed in each district to provide adequate educational program). With respect to contributions by municipalities belonging to a regional school district, each municipality is required to appropriate annually, in addition to other specified appropriations, "an amount equal to not less than the sum of the minimum required local contribution, federal impact aid, and all state school aid and grants for education but not including equity aid, for the fiscal year." G. L. c. 70, § 6. As pertinent here, the commissioner establishes, on an annual basis, each municipality's minimum required local contribution toward the operation of its public schools. See G. L. c. 70, §§ 2, 6. See also *Holden* v. *Wachusett Regional Sch. Dist. Comm.*, 445 Mass. 656, 659 (2005).

The formula used to calculate each municipality's minimum required contribution is wealth based, and requires more affluent municipalities to make larger contributions than less affluent municipalities. See *id.*, citing G. L. c. 70, §§ 2, 6. "As is the case with the Commonwealth as a whole, towns in regional school districts that have higher property values, higher income levels, and a greater ability to raise revenue have a relatively larger required contribution than towns in which the converse is true." *Holden* v. *Wachusett Regional Sch. Dist. Comm., supra* at 659-660. See *Hancock, supra* (Marshall, C.J., concurring). The Commonwealth provides the funds to make up the difference between municipalities' mandatory funding obligations and their respective foundation budgets. See G. L. c. 70, § 2; *Hancock, supra* at 438 (Marshall, C.J., concurring). The Legislature specifically provided in the Education Reform Act that, "*[n]otwithstanding the provisions of any regional school district agreement*, each member municipality shall increase its contribution to the regional district each fiscal year by the amount indicated in that district's share of the municipality's minimum regional

fiscal years, the foundation budget was to be the "base year foundation budget, as adjusted for enrollment and for inflation," *id.*, pursuant to G. L. c. 70, § 3.

461 Mass. 366 (2012)                                          373

Town of Dartmouth v. Greater New Bedford Regional Vocational Technical High School District.

contribution in that fiscal year" (emphasis added). G. L. c. 70, § 6.

In accordance with the Education Reform Act, the school district sent an annual letter to the member municipalities setting forth the amount of each municipality's minimum required contribution. Such contribution was calculated based on the formula set forth in the Education Reform Act, not on the municipality's percentage of student enrollment as provided by the regional agreement. As a consequence of this change in the calculation of funding obligations, Dartmouth has been required to contribute to the school district, for the fiscal years 2003 through 2008, over $3.7 million more than it would have been required to pay under the regional agreement, and Fairhaven has been required to contribute, for the same fiscal years, over $3.3 million more than it would have been required to pay under the regional agreement. By contrast, New Bedford has been required to contribute, for the fiscal years 2003 through 2008, almost $7.1 million less than it would have been required to pay under the regional agreement. In fiscal year 2008, Dartmouth contributed approximately 29.45 per cent of the school district's foundation budget, even though its students comprised only 10.09 per cent of the student body.

In allowing the motions to dismiss Dartmouth's complaint and Fairhaven's cross claim, the Superior Court judge concluded that the text of the Education Reform Act indicated a specific intent to override contrary provisions of the Special Act or regional agreement. He stated that the Education Reform Act was enacted to address comprehensively and deal uniformly with subject matters of concern to the entire Commonwealth. The judge also concluded that Dartmouth and Fairhaven could not raise constitutional claims against the Commonwealth where the function at issue — the funding of public education — was a core governmental concern and was unaffected by the Home Rule Amendment, art. 89 of the Amendments to the Massachusetts Constitution (Home Rule Amendment).

2. *Standard of review.* In reviewing the allowance of a motion to dismiss under Mass. R. Civ. P. 12 (b) (6), we examine the same pleadings as the motion judge and therefore proceed de novo. See *Curtis* v. *Herb Chambers I-95, Inc.*, 458 Mass.

374                              461 Mass. 366 (2012)

Town of Dartmouth *v.* Greater New Bedford Regional Vocational Technical High School District.

674, 676 (2011). We accept as true the allegations in the complaint and draw every reasonable inference in favor of the plaintiff. See *Warner-Lambert Co.* v. *Execuquest Corp.*, 427 Mass. 46, 47 (1998). We consider whether the factual allegations in the complaint are sufficient, as a matter of law, to state a recognized cause of action or claim, and whether such allegations plausibly suggest an entitlement to relief. See *Iannacchino* v. *Ford Motor Co.*, 451 Mass. 623, 636 (2008). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.*, quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007).

3. *Effect of Education Reform Act on Special Act.* Dartmouth and Fairhaven contend that the public school funding obligations enunciated in the Education Reform Act, see G. L. c. 70, § 6, did not repeal, by implication, the method set forth in the regional agreement for apportioning the expenses of the school district among the member municipalities. In their view, the Special Act, which permitted the creation of the school district in the first instance, is not so repugnant to, and inconsistent with, the Education Reform Act that both cannot stand. We disagree.

It is well established that "the provisions of a special act generally prevail over conflicting provisions of a subsequently enacted general law, absent a clear legislative intent to the contrary." *Boston Teachers Union, Local 66* v. *Boston*, 382 Mass. 553, 564 (1981). Our jurisprudence has not favored repeal of a statutory enactment by implication. See *Emerson College* v. *Boston*, 393 Mass. 303, 306-307 (1984) (Boston Zoning Code and Enabling Act, St. 1956, c. 665, not impliedly repealed by St. 1975, c. 808, codified at G. L. c. 40A, where both had coexisted without problems since 1976, and where zoning in Boston not intended to be governed by c. 40A); *Commonwealth* v. *Hayes*, 372 Mass. 505, 511-512 (1977); *Commonwealth* v. *Feodoroff*, 43 Mass. App. Ct. 725, 728-729 (1997). See generally 1A N.J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction § 23:10 (7th ed. 2009) (discussing judicially created presumption against repeal of prior laws by implication). This strong presumption against implied repeal of a prior law is overcome only when the earlier statute "is so repugnant to and

inconsistent with the later enactment covering the subject matter that both cannot stand." *Doherty* v. *Commissioner of Admin.*, 349 Mass. 687, 690 (1965). See *Commonwealth* v. *Bloomberg*, 302 Mass. 349, 352 (1939). "In the absence of irreconcilable conflict between an earlier special statute and a later general one the earlier statute will be construed as remaining in effect as an exception to the general statute." *North Shore Vocational Regional Sch. Dist.* v. *Salem*, 393 Mass. 354, 359 (1984). See *Haffner* v. *Director of Pub. Safety of Lawrence*, 329 Mass. 709, 714 (1953), quoting *Brown* v. *Lowell*, 8 Met. 172, 174 (1844) ("strong terms are required to show a legislative intent to supersede by a general act a special act which 'may be made in regard to a place, growing out of its peculiar wants, condition, and circumstances' ").

We have stated that "[r]epugnancy and inconsistency may exist when the Legislature enacts a law covering a particular field but leaves conflicting prior prescriptions unrepealed." *Doherty* v. *Commissioner of Admin.*, *supra*. See *Homer* v. *Fall River*, 326 Mass. 673, 676 (1951), quoting *Doyle* v. *Kirby*, 184 Mass. 409, 411-412 (1903) ("the enactment of a statute which seems to have been intended to cover the whole subject to which it relates, impliedly repeals all existing statutes touching the subject and supersedes the common law"). "Where such a conflict does appear it is the court's duty to give effect to the Legislature's intention in such a way that the later legislative action may not be futile. The earlier enactment must give way." *Doherty* v. *Commissioner of Admin.*, *supra*. In such circumstances, "the legislative intent to supersede local enactments need not be expressly stated for the State law to be given preemptive effect." *Boston Teachers Union, Local 66* v. *Boston*, *supra*. "Where legislation deals with a subject comprehensively, it 'may reasonably be inferred as intended to preclude the exercise of any local power or function on the same subject because otherwise the legislative purpose of that statute would be frustrated.' " *Id.*, quoting *Bloom* v. *Worcester*, 363 Mass. 136, 155 (1973). See *Warr* v. *Collector of Taxes of Taunton*, 234 Mass. 279, 281-282 (1920). "Thus, a statute designed to deal uniformly with a Statewide problem 'displays on its face an intent to supersede local and special laws and to repeal

inconsistent special statutes.' " *Boston Teachers Union, Local 66* v. *Boston, supra,* quoting *McDonald* v. *Superior Court,* 299 Mass. 321, 324 (1938). See *Boston Hous. Auth.* v. *Labor Relations Comm'n,* 398 Mass. 715, 719 (1986) (comprehensive nature of G. L. c. 150E, pertaining to public employee labor relations, must prevail over limitations on its applicability read into G. L. c. 121B, § 29, dealing with collective bargaining by public housing authorities). See generally 1A N.J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction, *supra* at § 23:9 (discussing implied repeal where later legislation covers whole subject of earlier legislation and is intended as substitute).

The over-all purpose of the Education Reform Act, "from its billions of dollars in additional financial aid to local school systems, to its establishment of teacher performance standards, is to improve the education provided to the students in the classrooms of our public schools." *School Dist. of Beverly* v. *Geller,* 435 Mass. 223, 235 (2001) (Cordy, J., concurring). See St. 1993, c. 71, preamble. To that end, the Education Reform Act "radically restructured the funding of public education across the Commonwealth based on uniform criteria of need, and dramatically increased the Commonwealth's mandatory financial assistance to public schools." *Hancock* v. *Commissioner of Educ.,* 443 Mass. 428, 432 (2005) (Marshall, C.J., concurring). It fixed the central problem of public school funding that had been identified as unconstitutional in *McDuffy* v. *Secretary of the Executive Office of Educ.,* 415 Mass. 545, 621 (1993), by eliminating "the principal dependence on local tax revenues that consigned students in property-poor districts to schools that were chronically short of resources, and unable to rely on sufficient or predictable financial or other assistance from the Commonwealth." *Hancock, supra* at 437. See note 7, *supra.*

Simply put, the Education Reform Act is comprehensive legislation designed to improve public education in every school district throughout the Commonwealth by, among other things, better public school funding. See *Holden* v. *Wachusett Regional Sch. Dist. Comm.,* 445 Mass. 656, 656-657 (2005) (Education Reform Act established entirely new system for public school finance and governance in Commonwealth); *Massachusetts Fed'n of Teachers, AFT, AFL-CIO* v. *Board of Educ.,* 436 Mass.

461 Mass. 366 (2012)                                          377

Town of Dartmouth *v.* Greater New Bedford Regional Vocational Technical High School District.

763, 765 & n.3 (2002). The Education Reform Act embodies "the Legislature's determination that wealthier towns in the Commonwealth pay a higher proportionate share of the costs of educating their students than less affluent towns." *Holden* v. *Wachusett Regional Sch. Dist. Comm., supra* at 657. See *Horrigan* v. *Mayor of Pittsfield,* 298 Mass. 492, 499 (1937), quoting *Attorney Gen.* v. *Williams,* 174 Mass. 476, 481 (1899) ("the Legislature may require any of the political subdivisions of the Commonwealth 'to bear such share of the public burdens as it deems just and equitable,' and . . . '[v]ery wide discretion is left with the law-making power in this particular' ").

The funding obligations imposed on the member municipalities by the regional agreement, based on each municipality's respective pupil enrollment, are wholly inconsistent with the public school funding obligations imposed by the Education Reform Act, see G. L. c. 70, § 6, and would frustrate the very purpose for which such comprehensive legislation was enacted.[9] In *Holden* v. *Wachusett Regional Sch. Dist. Comm., supra* at 660, we opined that "[i]n instituting the new funding scheme, the Legislature specifically provided that the minimum required local contributions supersede the assessments as calculated under a regional school district agreement." The language of the Education Reform Act stating that "[n]otwithstanding the provisions of any regional school district agreement, each member municipality shall increase its contribution to the regional district each fiscal year by the amount indicated in that district's share of the municipality's minimum regional contribution in that fiscal year," G. L. c. 70, § 6, evidences an explicit intent by the Legislature to implement a new public school funding model for the entire Commonwealth, including the school district, irrespective of prior legislation, such as the Special Act, that included different provisions for school funding.[10]

Continued adherence by the member municipalities to the

[9]Although the precise method of apportioning the expenses of the school district among the member municipalities was set forth in the regional agreement, the Special Act mandated the creation of such an agreement and specified the matters to be included therein.

[10]The suggestion by Dartmouth and Fairhaven that the Education Reform Act and the Special Act can be construed harmoniously by concluding that the Education Reform Act establishes the minimum funding obligation for the

funding terms of the regional agreement would impermissibly interfere with efforts by the Legislature to address deficiencies in the public education system by enacting comprehensive legislation to "standardize[] Statewide criteria of funding and oversight." *Hancock, supra* at 433-434. As is its purview, the Legislature has determined that implementation of a wealth-based formula to calculate each municipality's required contribution to its local school district is the appropriate mechanism to address substantial resource disparities so that children across the Commonwealth, including those from Dartmouth, Fairhaven, and New Bedford, can partake of the same educational opportunities. Accordingly, we conclude that the public school funding obligations imposed on the member municipalities by the Education Reform Act supersede the funding provisions of the regional agreement.

4. *Standing to raise constitutional claims.* Dartmouth and Fairhaven next contend that they have standing to challenge, on constitutional grounds, the public school funding obligations imposed on the member municipalities by the Education Reform Act. See G. L. c. 70, § 6. Dartmouth argues that these funding obligations have interfered with the operation of the regional agreement in violation of the contract clause of the United States Constitution.[11] Fairhaven asserts that such funding obligations are a disproportionate tax on the property and income of

school district as a whole, whereas the regional agreement governs how the member municipalities allocate that obligation among themselves, does not comport with either the language or the intent of the Education Reform Act. The Education Reform Act plainly states that "each member municipality" shall increase its contribution to the school district each fiscal year in an amount established by the commissioner, G. L. c. 70, § 6, thereby suggesting that the minimum funding obligation for the member municipalities is not governed by the regional agreement. Further, the Education Reform Act is intended to "assure fair and adequate minimum per student funding for public schools in the [C]ommonwealth" by defining a standard of local funding "applicable to *every city and town,*" not merely to every school district (emphasis added). G. L. c. 70, § 1. Only if the school district chooses to spend additional amounts *in excess of* the minimum required local contributions can such amounts be charged to the member municipalities according to the regional agreement. See G. L. c. 70, § 6; *Holden v. Wachusett Regional Sch. Dist. Comm.*, 445 Mass. 656, 660 (2005).

[11]Article I, § 10, cl. 1, of the United States Constitution provides, in relevant part: "No state shall . . . pass any . . . law impairing the obligation of contracts . . . ."

its residents in violation of the Massachusetts Constitution. See note 3, *supra*. We conclude that Dartmouth and Fairhaven do not have standing to challenge the constitutionality of the public school funding obligations imposed by the Education Reform Act.

A town is a political subdivision of the Commonwealth. See *Daveiga* v. *Boston Pub. Health Comm'n*, 449 Mass. 434, 442 (2007); *Murphy* v. *Planning Bd. of Hopkinton*, 70 Mass. App. Ct. 385, 396 (2007). See also *Opinion of the Justices*, 303 Mass. 631, 639 (1939), quoting *Lee* v. *Lynn*, 223 Mass. 109, 112 (1916) (cities and towns of Commonwealth are divisions of government established in public interest). Apart from the limited exceptions discussed *infra*, a wide range of cases have held that governmental entities lack standing to challenge the "acts of their creator State." *Spence* v. *Boston Edison Co.*, 390 Mass. 604, 610 (1983) (*Spence*). See, e.g., *Massachusetts Bay Transp. Auth.* v. *Auditor of the Commonwealth*, 430 Mass. 783, 792-793 (2000) (statutorily created agency did not have standing to challenge constitutionality of State statute governing privatization contracts); *Clean Harbors of Braintree, Inc.* v. *Board of Health of Braintree*, 415 Mass. 876, 878-879 (1993) (municipal agency of town lacked standing to challenge constitutionality of amendment to State statute); *Trustees of Worcester State Hosp.* v. *The Governor*, 395 Mass. 377, 380 (1985) (unlawful takings claim barred because trustees of State hospital could not challenge constitutionality of State statutes); *Boston Water & Sewer Comm'n* v. *Commonwealth*, 64 Mass. App. Ct. 611, 615-616 (2005) (government agency lacked standing to challenge special legislation that allowed taking by eminent domain of certain land owned by agency). See also *Trenton* v. *New Jersey*, 262 U.S. 182, 188 (1923) (city lacked standing to challenge State's imposition of fee for diverting water from Delaware River because "[t]he power of the State, unrestrained by the contract clause or the Fourteenth Amendment [to the United States Constitution], over the rights and property of cities held and used for 'governmental purposes' cannot be questioned"); *Hugo* v. *Nichols*, 656 F.3d 1251, 1257-1258 (10th Cir. 2011) (Supreme Court has made clear that United States Constitution does not contemplate rights of political subdivisions as against their parent States).

"The decisional law rests on the proposition that constitutional protections belong to 'persons,' including private corporations, who are generally considered independent of the Commonwealth." *Commissioners of Hampden County* v. *Agawam*, 45 Mass. App. Ct. 481, 483-484 (1998) (county commissioners, being governmental entities, did not possess constitutional rights of individual citizens and therefore lacked standing to challenge State statute directing commissioners to convey certain parcels of land to town, even though impact of statute could diminish or abrogate property rights). See *Cote-Whitacre* v. *Department of Pub. Health*, 446 Mass. 350, 374 (2006) (Spina, J., concurring) (municipal clerks had no standing in official capacity to raise claim alleging unconstitutional selective enforcement of statutory scheme, but did have standing in individual capacity to raise such claim); *Horton* v. *Attorney Gen.*, 269 Mass. 503, 513-514 (1929) (only one whose personal interests are directly affected by operation of statute can challenge its constitutional validity). Dartmouth and Fairhaven, as political subdivisions of the Commonwealth that exist to carry out a public purpose, are not "persons" for purposes of challenging the constitutionality of the public school funding obligations imposed by the Education Reform Act. See *Spence*, *supra* at 608-609 (generally speaking, municipality may not be "person" for purpose of challenging constitutionality of State statute); *Commissioners of Hampden County* v. *Agawam*, *supra*.

Contrary to the assertion of Dartmouth and Fairhaven, our decision in *Brookline* v. *The Governor*, 407 Mass. 377 (1990) (*Brookline*), does not provide authority for the proposition that they have standing to challenge the constitutionality of G. L. c. 70, § 6. There, the court concluded, among other things, that St. 1989, c. 240, § 6, which purported to limit the distribution of State lottery proceeds to cities and towns during the 1989 and 1990 fiscal years, was lawful. See *Brookline*, *supra* at 382. This court stated that, in light of its resolution of the case, it need not decide whether the plaintiffs had standing to argue that St. 1989, c. 240, § 6, "could not constitutionally replace the local aid distribution procedure described in the General Laws." *Id.* at 384. The language in *Brookline* on which Dartmouth and Fairhaven rely states: "If the plaintiff municipalities lack stand-

ing to challenge the lawfulness of § 6, no one else is likely to have any greater standing to do so. We would be reluctant to tolerate a situation in which allegedly unconstitutional conduct would be free from judicial scrutiny even on the request of an entity most directly affected by the alleged unlawful conduct." *Id.* at 384 n.10. This language is merely dicta, unnecessary to the holding of the case, and does not confer standing on Dartmouth and Fairhaven. See *Massachusetts Bay Transp. Auth.* v. *Auditor of the Commonwealth, supra* at 793 (declining to permit agency to challenge constitutionality of State statute based on "comment" in *Brookline*). See also *Tax Equity Alliance for Mass.* v. *Commissioner of Revenue*, 423 Mass. 708, 716 (1996) ("an unfounded assumption that, if the individual plaintiffs lack standing, no one will have standing to sue, is not a reason to find standing where none exists"). We add that in a concurring opinion in *Brookline*, Chief Justice Liacos stated that "neither the municipalities nor the individuals who are plaintiffs in their official capacities (such as selectmen, mayors, and school committee members) have standing to challenge the constitutionality of the statutes at issue." *Brookline, supra* at 387 (Liacos, C.J., concurring).

We have recognized the existence of several limited exceptions to the "prohibition on constitutional challenges by governmental entities to acts of their creator State," *Spence, supra* at 610, but none provides a basis for relief to Dartmouth and Fairhaven. First, in *LaGrant* v. *Boston Hous. Auth.*, 403 Mass. 328, 331 (1988), we held that "agencies . . . have standing to challenge the constitutionality of a State statute when it is alleged that the statute represents legislative encroachment on judicial power in violation of art. 30" of the Massachusetts Declaration of Rights. See *Massachusetts Bay Transp. Auth.* v. *Auditor of the Commonwealth, supra* at 792-793; *Clean Harbors of Braintree, Inc.* v. *Board of Health of Braintree, supra* at 879. Neither Dartmouth nor Fairhaven has raised such an allegation.

Second, we have stated that a governmental entity may be a "person" for the purpose of challenging the constitutionality of a State statute "where the parties are both acting in a private capacity and where there is absolutely no 'public aspect' to the

transaction." *Spence, supra* at 609, 610. "In such circumstances, 'the sovereign entity involved is acting not in its sovereign capacity but rather is engaging in commercial and business transactions such as other persons, natural or artificial, are accustomed to conduct.' " *Boston Water & Sewer Comm'n* v. *Commonwealth, supra* at 615, quoting *Spence, supra* at 609. Here, the member municipalities were not acting in a "private" capacity and engaging in a purely commercial or business transaction. Rather, they were acting in their public capacity and fulfilling the Commonwealth's obligation to provide an appropriate education to the children of the school district.

Finally, a municipality has standing to raise a claim that a legislative enactment violates the Home Rule Amendment, which restricts the Legislature's power to act in relation to cities and towns.[12] See *Clean Harbors of Braintree, Inc.* v. *Board of Health of Braintree, supra* at 880-881, and cases cited. "The Home Rule Amendment preserves the right of municipalities to self-government in 'local matters,' but preserves the Commonwealth's right to legislate with respect to State, regional, and general matters." *Id.* at 881. As such, the Home Rule Amendment is to be construed narrowly, see *id.*, and it does not "preclude the Legislature 'from acting on matters of State, regional, or general concern, even though such action may have special effect upon one or more individual cities or towns.' " *Hadley* v. *Amherst,* 372 Mass. 46, 50 (1977), quoting *Opinion of the Justices,* 356 Mass. 775, 787-788 (1969). The comprehensive overhaul of public school education, including the mechanism by which public schools are funded, is a matter of State, regional, and general concern and falls within the ambit of retained legislative power. Therefore, Dartmouth and Fairhaven do not have

---

[12]Article 89, § 6, of the Amendments to the Massachusetts Constitution provides, in relevant part: "Any city or town may, by the adoption, amendment, or repeal of local ordinances or by-laws, exercise any power or function which the general court has power to confer upon it, which is not inconsistent with the constitution or laws enacted by the general court . . . ." Further, § 8 of art. 89 states, in pertinent part: "The general court shall have the power to act in relation to cities and towns, but only by the general laws which apply alike to all cities, or to all towns, or to all cities and towns, or to a class of not fewer than two . . . ."

standing to raise their constitutional claims pursuant to the Home Rule Amendment.[13]

5. *Conclusion.* In light of our resolution of the issues presented in this appeal, Dartmouth and Fairhaven have failed to state a claim on which relief may be granted. Accordingly, the complaint filed by Dartmouth and the cross claim filed by Fairhaven were properly dismissed.

*Judgment affirmed.*

---

[13]In its complaint, Dartmouth asserted that the imposition of public school funding obligations on the member municipalities by the Education Reform Act resulted in an unconstitutional taking of Dartmouth's property without just compensation. Dartmouth has not pursued this argument in its appellate brief. Even if it had, the argument would fail for the reasons articulated with respect to Dartmouth's other constitutional claim.